# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
CASE NO.

OMEGA SA, BLANCPAIN SA,
COMPAGNIE DES MONTRES LONGINES,
FRANCILLON S.A., GLASHÜTTER
UHRENBETRIEB GmbH, HAMILTON
INTERNATIONAL AG, MONTRES JAQUET
DROZ SA, and TISSOT SA,

                Plaintiffs,

vs.

THE INDIVIDUALS, PARTNERSHIPS AND
UNINCORPORATED ASSOCIATIONS
IDENTIFIED ON SCHEDULE "A,"

                Defendants.

_____/

## COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Plaintiffs, Omega SA, Blancpain SA, Compagnie des Montres Longines, Francillon S.A.,

Glashütter Uhrenbetrieb GmbH, Hamilton International AG, Montres Jaquet Droz SA, and

Tissot SA (collectively "Plaintiffs")[1] hereby sue Defendants, the Individuals, Partnerships, and

Unincorporated Associations identified on Schedule "A" (collectively "Defendants").

Defendants are promoting, selling, offering for sale, and/or distributing goods bearing

counterfeits and confusingly similar imitations of Plaintiffs' trademarks within this district

through various Internet based e-commerce stores operating under their seller identities set forth

on Schedule "A" hereto (the "Seller IDs"). In support of their claims, Plaintiffs allege as follows:

---

[1] Plaintiffs are subsidiaries of The Swatch Group Ltd., which is one of the world's largest watch
manufacturers.

**JURISDICTION AND VENUE**

1. This is an action for federal trademark counterfeiting and infringement, false designation of origin, common law unfair competition and common law trademark infringement pursuant to 15 U.S.C. §§ 1114, 1116, and 1125(a), The All Writs Act, 28 U.S.C. § 1651(a), and Florida's common law. Accordingly, this Court has subject matter jurisdiction over this action pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331 and 1338.  This Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367 over Plaintiffs' state law claims because those claims are so related to the federal claims that they form part of the same case or controversy.

2. Defendants are subject to personal jurisdiction in this district, because they direct business activities toward and conduct business with consumers throughout the United States, including within the State of Florida and this district through at least the Internet based e-commerce stores accessible in Florida and operating under the Seller IDs.

3. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 since Defendants are, upon information and belief, aliens engaged in infringing activities and causing harm within this district by advertising, offering to sell, selling and/or shipping infringing products into this district.

**THE PLAINTIFFS**

4. Omega SA ("Omega") is a corporation organized under the laws of Switzerland with its principal place of business located at Jakob-Stämpfli-Strasse 96, CH-2502 Biel/Bienne, Switzerland.  Omega manufactures, markets, and sells watches and related goods throughout the world, including within this district, under multiple world-famous common law and federally registered trademarks, including the trademarks identified in Paragraph 22 below.

5.      Blancpain SA ("Blancpain") is a corporation organized under the laws of Switzerland with its principal place of business located at Le Rocher 12, CH-1348 Le Brassus, Switzerland.  Blancpain manufactures, markets, and sells watches and related goods throughout the world, including within this district, under multiple world-famous common law and federally registered trademarks, including the trademarks identified in Paragraph 28 below.

6.      Compagnie des Montres Longines, Francillon S.A. ("Longines") is a corporation organized and existing under the laws of Switzerland with its principal place of business located at Rue des Noyettes 8, CH-2610 St-Imier, Switzerland. Longines manufactures, markets, and sells watches and related goods throughout the world, including within this district, under multiple world-famous common law and federally registered trademarks, including the trademarks identified in Paragraph 34 below.

7.      Glashütter Uhrenbetrieb GmbH ("Glashütte Original") is a corporation organized and existing under the laws of Germany with its principal place of business located at Altenberger Str. 1, D-01768 Glashütte, Germany. Glashütte Original manufactures, markets, and sells watches and related goods throughout the world, including within this district, under world-famous common law and federally registered trademarks including, the trademarks identified in Paragraph 40 below.

8.      Hamilton International AG ("Hamilton") is a corporation organized and existing under the laws of Switzerland with its principal place of business located at Mattenstrasse 149, CH-2610 Biel/Bienne, Switzerland. Hamilton manufactures, markets, and sells watches and related goods throughout the world, including within this district, under multiple world-famous common law and federally registered trademarks, including the trademarks identified in Paragraph 46 below.

9.      Montres Jaquet Droz SA ("Jaquet Droz") is a corporation organized and existing under the laws of Switzerland with its principal place of business located at Allée du Tourbillon 2, CH-2300 La Chaux-de-Fonds, Switzerland. Jaquet Droz manufactures, markets, and sells watches and related goods throughout the world, including within this district, under multiple world-famous common law and federally registered trademarks, including the trademarks identified in Paragraph 52 below.

10.     Tissot SA ("Tissot") is a corporation organized and existing under the laws of Switzerland with its principal place of business located in Chemin des Tourelles 17, CH-2400 Le Locle, Switzerland.  Tissot manufactures, markets, and sells watches and related goods throughout the world, including within this district, under multiple world-famous common law and federally registered trademarks, including the trademarks identified in Paragraph 58 below.

11.     Plaintiffs' trademarked goods are sold within the State of Florida, including this district, through their boutiques and at select and prestigious retailers. Defendants, through the sale and offer to sell counterfeit and infringing versions of Plaintiffs' branded products, are directly, and unfairly, competing with Plaintiffs' economic interests in the State of Florida and causing Plaintiffs harm within this jurisdiction.

12.     Like many other famous trademark owners, Plaintiffs suffer ongoing daily and sustained violations of their trademark rights at the hands of counterfeiters and infringers, such as Defendants herein, who wrongfully reproduce and counterfeit Plaintiffs' trademarks for the twin purposes of (i) duping and confusing the consuming public and (ii) earning substantial profits across their e-commerce stores. The natural and intended byproduct of Defendants' actions is the erosion and destruction of the goodwill associated with Plaintiffs' respective names and trademarks, as well as the destruction of the legitimate market sector in which they operate.

4

13.     In order to combat the indivisible harm caused by the combined actions of Defendants and others engaging in similar conduct, each year Plaintiffs expend significant resources in connection with trademark enforcement efforts, including legal fees, investigative fees, and support mechanisms for law enforcement, such as field training, guides and seminars. The exponential growth of counterfeiting over the Internet, particularly through online marketplace and social media platforms, has created an environment that require companies, such as Plaintiffs, to expend significant time and money across a wide spectrum of efforts in order to protect both consumers and themselves from the ill effects of confusion and the erosion of the goodwill connected to Plaintiffs' brands.

## THE DEFENDANTS

14.     Defendants are individuals, partnerships, and/or business entities of unknown makeup, each of whom, upon information and belief, either reside and/or operate in foreign jurisdictions, or redistribute products from the same or similar sources in those locations and/or ship their goods from the same or similar sources in those locations to shipping and fulfillment centers within the United States to redistribute their products from those locations.  Defendants have the capacity to be sued pursuant to Federal Rule of Civil Procedure 17(b).  Defendants target their business activities towards consumers throughout the United States, including within this district, through the operation of the Internet based e-commerce stores via Internet marketplace websites under the Seller IDs.

15.     Defendants use aliases in conjunction with the operation of their businesses, including but not limited to those identified on Schedule "A."

16.     Defendants are the past and present controlling forces behind the sale of products bearing counterfeits and infringements of Plaintiffs' trademarks as described herein using at least the Seller IDs.

17.     Defendants directly engage in unfair competition with Plaintiffs by advertising, offering for sale, and selling goods bearing and/or using counterfeits and infringements of one or more of Plaintiffs' trademarks to consumers within the United States and this district through Internet based e-commerce stores using, at least, the Seller IDs, and additional names, e-commerce stores, and seller identification aliases not yet known to Plaintiffs. Defendants have purposefully directed some portion of their illegal activities towards consumers in the State of Florida through the advertisement, offer to sell, sale, and/or shipment of counterfeit and infringing branded versions of Plaintiffs' goods into the State, which impacts and interferes with commerce throughout the United States, including within the State of Florida.

18.     Defendants have registered, established or purchased, and maintained the Seller IDs. Defendants may have engaged in fraudulent conduct with respect to the registration of the Seller IDs by providing false and/or misleading information to the Internet based e-commerce platforms where they offer to sell and/or sell, during the registration or maintenance process related to their respective Seller IDs. Upon information and belief, many Defendants have registered and/or maintained their Seller IDs for the sole purpose of engaging in illegal counterfeiting activities.

19.     Defendants will likely continue to register or acquire new seller identification aliases for the purpose of selling and offering for sale goods bearing counterfeit and confusingly similar imitations of Plaintiffs' trademarks unless preliminarily and permanently enjoined.

20.     Defendants use their Internet-based businesses to infringe the intellectual property rights of Plaintiffs and others.

21.     Defendants' business names, i.e., the Seller IDs, associated payment accounts, and any other alias seller identification names and aliases used in connection with the sale of counterfeit and infringing goods bearing one or more of Plaintiffs' trademarks are essential components of Defendants' online activities and are one of the means by which Defendants further their counterfeiting and infringement scheme and cause harm to Plaintiffs.  Moreover, Defendants are using one or more of Plaintiffs' respective famous names and/or trademarks to drive Internet consumer traffic to their e-commerce stores operating under the Seller IDs, thereby increasing the value of the Seller IDs and decreasing the size and value of Plaintiffs' legitimate marketplace at Plaintiffs' expense.

## COMMON FACTUAL ALLEGATIONS

### Omega's Rights

22.     Omega is the owner of the following trademarks which are valid and registered on the Principal Register of the United States Patent and Trademark Office (the "Omega Marks"):

| Trademark | Registration Number | Registration Date | Class / Goods |
|-----------|--------------------|------------------|--------------|
| Ω OMEGA | 025,036 | July 24, 1894 | IC 014. Watch movements and watch cases. |
| SEAMASTER | 556,602 | March 25, 1952 | IC 014. Watches, watch parts and watch movements. |
| OMEGA | 566,370 | November 4, 1952 | IC 014. Watches and parts thereof. |

| Mark | Reg. No. | Date | Goods |
|---|---|---|---|
| Ω OMEGA | 578,041 | July 28, 1953 | IC 014. Watches (including pocket watches, wrist watches with or without straps, bands or bracelets, pendant watches, calendar watches, and stopwatches) either stem-wind or automatic; clocks; chronometers, chronographs, and parts for all of the foregoing. |
| SPEEDMASTER | 672,487 | January 13, 1959 | IC 014. Watches and clocks. |
| Ω | 734,891 | July 24, 1962 | IC 014. Timepieces and Parts Thereof. |
| CONSTELLATION | 1,223,349 | January 11, 1983 | IC 014. Watches and parts thereof. |
| DE VILLE | 1,309,929 | December 18, 1984 | IC 014. Watches, Wrist Watches, Portfolio Watches, Pendant Watches, and Miniature Clocks; and Parts Thereof. |
|  | 1,776,436 | June 15, 1993 | IC 014. Watches. |
|  | 1,827,397 | March 22, 1994 | IC 014. Watches. |
|  | 2,747,149 | August 5, 2003 | IC 014. Watches, watches made of precious metals, watches partly or entirely set with precious stones and parts thereof, watch straps, watch bracelets and parts thereof; chronographs, chronometers and parts thereof. |
|  | 2,912,918 | December 21, 2004 | IC 014. Watches, [ watch straps, watch bracelets and parts for the aforesaid goods; ] chronometers, chronographs; watches made of precious metals; watches partly or entirely set with precious stones. |
| PLANET OCEAN | 3,085,659 | April 25, 2006 | IC 014. Watches and watch parts. |
| BROAD ARROW | 3,418,186 | April 29, 2008 | IC 014. Watches, [ watch straps, watch bracelets and parts thereof; ] chronometers, chronographs, watches made of precious metals, watches partly or entirely set with precious stones. |
| SEAMASTER | 3,640,080 | June 16, 2009 | IC 014. Jewelry, [ precious stones; ] horological and chronometrical instruments. |

8

| | | | |
|---|---|---|---|
|  | 3,757,932 | March 9, 2010 | IC 014. [jewelry and precious stones;] horological and chronometric instruments. |
| AQUA TERRA | 4,299,644 | March 12, 2013 | IC 014. Watches, watch straps, watch bracelets and parts thereof, chronometers, chronographs for use as watches, watches made of precious metals, watches partly or entirely set with precious stones. |
| CO-AXIAL | 4,442,192 | December 3, 2013 | IC 014. Horological and chronometric instruments. |
| DARK SIDE OF THE MOON | 4,735,993 | May 12, 2015 | IC 014. Horological and chronometric instruments. |
| Ω OMEGA | 5,094,915 | December 6, 2016 | IC 014. Horological and chronometric instruments and parts for the aforesaid goods; accessories namely, watch chains, presentation cases for watches and cases for watches. |
| MOONWATCH | 5,211,480 | May 30, 2017 | IC 014. Horological and chronometric instruments. |
| CO-AXIAL MASTER CHRONOMETER | 5,266,563 | August 15, 2017 | IC 014. Horological and chronometric instruments. |

The Omega Marks are used in connection with the manufacture and distribution of high-quality goods in the category identified above. True and correct copies of the Certificates of Registration for the Omega Marks are attached hereto as Composite Exhibit "1."

23.     Long before the Defendants began their infringing activities complained of herein, the Omega Marks have been used by Omega in interstate commerce to identify and distinguish Omega's high-quality goods for an extended period of time and serve as symbols of Omega's quality, reputation and goodwill.

24.     Omega expends substantial resources developing, advertising and otherwise promoting the Omega Marks.  Omega and related companies have spent significant monetary resources to extensively advertise and promote products under the Omega Marks in magazines, newspapers, on the Internet and in other media worldwide, including the official Omega website,

9

www.omegawatches.com. The Omega Marks qualify as famous marks as that term is used in 15 U.S.C. §1125(c)(1).

25.     Further, Omega extensively uses, advertises and promotes the Omega Marks in the United States in connection with the sale of high-quality goods.  As a result, the Omega Marks are widely recognized trademarks in the United States, and the trademarks have achieved secondary meaning as identifiers of high-quality goods.

26.     Omega has carefully monitored and policed the use of the Omega Marks and has never assigned or licensed the Omega Marks to any of the Defendants in this matter.

27.     Genuine goods bearing the Omega Marks are widely legitimately advertised and promoted by Omega and related companies, authorized distributors and unrelated third parties via the Internet.  Over the course of the past several years, visibility on the Internet, particularly via Internet search engines such as Google, Yahoo!, and Bing has become increasingly important to Omega's overall marketing and consumer education efforts. Thus, Omega and related companies expend significant monetary resources on Internet marketing and consumer education, including search engine optimization ("SEO") strategies. Those strategies allow Omega and its authorized retailers to fairly and legitimately educate consumers about the value associated with the Omega Marks and the goods sold thereunder.  Similarly, Defendants' individual seller stores are indexed on search engines and compete directly with Omega for space in the search results.

**Blancpain's Rights**

28.      Blancpain is the owner of the following trademarks which are valid and registered on the Principal Register of the United States Patent and Trademark Office (the "Blancpain Marks"):

| Trademark | Registration Number | Registration Date | Class / Goods |
|---|---|---|---|
| *Fifty Fathoms* | 661,036 | April 29, 1958 | IC 014. Mechanical watches. |
| **BLANCPAIN** | 1,727,428 | October 27, 1992 | IC 014. Watches and parts thereof. |
| JB 1735 | 4,518,491 | June 4, 2013 | IC 014. Jewelry [, precious stones ] ; horological and chronometric instruments. |

The Blancpain Marks are used in connection with the manufacture and distribution of high-quality goods in the category identified above. True and correct copies of the Certificates of Registration for the Blancpain Marks are attached hereto as Composite Exhibit "2."

29.      Long before the Defendants began their infringing activities complained of herein, the Blancpain Marks have been used by Blancpain in interstate commerce to identify and distinguish Blancpain's high-quality goods for an extended period of time and serve as symbols of Blancpain's quality, reputation and goodwill.

30.      Blancpain expends substantial resources developing, advertising and otherwise promoting the Blancpain Marks.  Blancpain and related companies have spent significant monetary resources to extensively advertise and promote products under the Blancpain Marks in magazines, newspapers, on the Internet and in other media worldwide, including the official Blancpain website, www.blancpain.com. The Blancpain Marks qualify as famous marks as that term is used in 15 U.S.C. §1125(c)(1).

31.     Further, Blancpain extensively uses, advertises and promotes the Blancpain Marks in the United States in connection with the sale of high-quality goods. As a result, the Blancpain Marks are widely recognized trademarks in the United States, and the trademarks have achieved secondary meaning as identifiers of high-quality goods.

32.     Blancpain has carefully monitored and policed the use of the Blancpain Marks and has never assigned or licensed the Blancpain Marks to any of the Defendants in this matter.

33.     Genuine goods bearing the Blancpain Marks are widely legitimately advertised and promoted by Blancpain and related companies, authorized distributors and unrelated third parties via the Internet.  Over the course of the past several years, visibility on the Internet, particularly via Internet search engines such as Google, Yahoo!, and Bing has become increasingly important to Blancpain's overall marketing and consumer education efforts. Thus, Blancpain and related companies expend significant monetary resources on Internet marketing and consumer education, including SEO strategies. Those strategies allow Blancpain and its authorized retailers to fairly and legitimately educate consumers about the value associated with the Blancpain Marks and the goods sold thereunder. Similarly, Defendants' individual seller stores are indexed on search engines and compete directly with Blancpain for space in the search results.

**Longines' Rights**

34.    Longines is the owner of the following trademarks which are valid and registered

on the Principal Register of the United States Patent and Trademark Office (the "Longines

Marks"):

| Trademark | Registration Number | Registration Date | Class / Goods |
|---|---|---|---|
| *LONGINES* | 065,109 | September 10, 1907 | IC 014. Watches, parts of watches, and watchcases |
| LONGINES | 668,956 | October 28, 1958 | IC 014. Watches and watch movements and parts thereof |
| | 1,328,417 | April 2, 1985 | IC 014.  Clocks, Watches and Parts Therefor, and Jewelry and Costume Jewelry |
| **LONGINES** | 1,377,147 | January 7, 1986 | IC 014. Watches and parts therefor, and jewelry and costume jewelry. |
| THE LONGINES MASTER COLLECTION | 2,995,368 | September 13, 2005 | IC 014. Precious metals and their alloys, namely, white gold, yellow gold, pink gold; jewelry watches, precious stones, namely diamonds, horological and chronometric instruments, namely, chronographs, chronometers for use as watches, watches, watch movement |

The Longines Marks are used in connection with the manufacture and distribution of high-

quality goods in the category identified above. True and correct copies of the Certificates of

Registration for the Longines Marks are attached hereto as Composite Exhibit "3."

35.    Long before the Defendants began their infringing activities complained of

herein, the Longines Marks have been used by Longines in interstate commerce to identify and

distinguish Longines' high-quality goods for an extended period of time and serve as symbols of

Longines' quality, reputation and goodwill.

36.     Longines expends substantial resources developing, advertising and otherwise promoting the Longines Marks.  Longines and related companies have spent significant monetary resources to extensively advertise and promote products under the Longines Marks in magazines, newspapers, on the Internet and in other media worldwide, including the official Longines website, www.longines.com. The Longines Marks qualify as famous marks as that term is used in 15 U.S.C. §1125(c)(1).

37.     Further, Longines extensively uses, advertises and promotes the Longines Marks in the United States in connection with the sale of high-quality goods. As a result, the Longines Marks are widely recognized trademarks in the United States, and the trademarks have achieved secondary meaning as identifiers of high-quality goods.

38.     Longines has carefully monitored and policed the use of the Longines Marks and has never assigned or licensed the Longines Marks to any of the Defendants in this matter.

39.     Genuine goods bearing the Longines Marks are widely legitimately advertised and promoted by Longines and related companies, authorized distributors and unrelated third parties via the Internet.  Over the course of the past several years, visibility on the Internet, particularly via Internet search engines such as Google, Yahoo!, and Bing has become increasingly important to Longines' overall marketing and consumer education efforts. Thus, Longines and related companies expend significant monetary resources on Internet marketing and consumer education, including SEO strategies. Those strategies allow Longines and its authorized retailers to fairly and legitimately educate consumers about the value associated with the Longines Marks and the goods sold thereunder. Similarly, Defendants' individual seller stores are indexed on search engines and compete directly with Longines for space in the search results.

**Glashütte Original's Rights**

40.     Glashütte Original is the owner of the following trademark which is valid and registered on the Principal Register of the United States Patent and Trademark Office (the "Glashütte Original Mark"):

| Trademark | Registration Number | Registration Date | Class / Goods |
| --- | --- | --- | --- |
|  | 2,519,207 | December 18, 2001 | C 014. horological and chronometric instruments, namely, watches, parts of clocks and watches [, alarms for clocks, precious metals and their alloys sold in bulk, precious metals, jewelry, precious gemstones, imitation jewelry, cufflinks, tie pins, and belt buckles made of precious metal ]. |

The Glashütte Original Mark is used in connection with the manufacture and distribution of high-quality goods in the category identified above. A true and correct copy of the Certificate of Registration for the Glashütte Original Mark is attached hereto as Composite Exhibit "4."

41.     Long before the Defendants began their infringing activities complained of herein, the Glashütte Original Mark has been used by Glashütte Original in interstate commerce to identify and distinguish Glashütte Original's high-quality goods for an extended period of time and serves as a symbol of Glashütte Original's quality, reputation and goodwill.

42.     Glashütte Original expends substantial resources developing, advertising and otherwise promoting the Glashütte Original Mark. Glashütte Original and related companies have spent significant monetary resources to extensively advertise and promote products under the Glashütte Original Mark in magazines, newspapers, on the Internet and in other media worldwide, including the official Glashütte Original website, www.glashuette-original.com. The

Glashütte Original Mark qualifies as a famous mark as that term is used in 15 U.S.C. §1125(c)(1).

43.     Further, Glashütte Original has extensively used, advertised and promoted the Glashütte Original Mark in the United States in connection with the sale of high-quality goods. As a result, the Glashütte Original Mark is a widely recognized trademark in the United States, and the trademark has achieved secondary meaning as an identifier of high-quality goods.

44.     Glashütte Original has carefully monitored and policed the use of the Glashütte Original Mark and has never assigned or licensed the Glashütte Original Mark to any of the Defendants in this matter.

45.     Genuine goods bearing the Glashütte Original Mark are widely legitimately advertised and promoted by Glashütte Original and related companies, authorized distributors and unrelated third parties via the Internet.  Over the course of the past several years, visibility on the Internet, particularly via Internet search engines such as Google, Yahoo!, and Bing has become increasingly important to Glashütte Original's overall marketing and consumer education efforts. Thus, Glashütte Original and related companies expend significant monetary resources on Internet marketing and consumer education, including SEO strategies. Those strategies allow Glashütte Original and its authorized retailers to fairly and legitimately educate consumers about the value associated with the Glashütte Original Mark and the goods sold thereunder. Similarly, Defendants' individual seller stores are indexed on search engines and compete directly with Glashütte Original for space in the search results.

**Hamilton's Rights**

46.    Hamilton is the owner of the following trademarks which are valid and registered on the Principal Register of the United States Patent and Trademark Office (the "Hamilton Marks"):

| Trademark | Registration Number | Registration Date | Class / Goods |
|---|---|---|---|
| HAMILTON | 741,279 | November 27, 1962 | IC 014. Horological Instruments-Namely, Watches, Clocks, Chronometers, and Parts Thereof |
| VENTURA | 1,622,393 | November 13, 1990 | IC 014. Watches, clocks and parts thereof |
| Hamilton | 2,181,720 | August 18, 1998 | IC 014. Watches |
| HAMILTON | 5,168,258 | March 21, 2017 | IC 014. Horological and chronometric instruments, namely, watches, chronographs, clocks, watches, watch bracelets, clocks, alarm clocks and parts and fittings for the aforesaid goods, namely, needles, anchors, rockers, barrels, watch cases, watch straps, watch dials, clockworks, watch chains, watch movements, watch springs, watch glasses, cases for watchmaking, cases for watches |

The Hamilton Marks are used in connection with the manufacture and distribution of high-quality goods in the category identified above. True and correct copies of the Certificates of Registration for the Hamilton Marks are attached hereto as Composite Exhibit "5."

47.    Long before the Defendants began their infringing activities complained of herein, the Hamilton Marks have been used by Hamilton in interstate commerce to identify and distinguish Hamilton's high-quality goods for an extended period of time and serve as symbols of Hamilton's quality, reputation and goodwill.

48.     Hamilton expends substantial resources developing, advertising and otherwise promoting the Hamilton Marks.  Hamilton and related companies have spent significant monetary resources to extensively advertise and promote products under the Hamilton Marks in magazines, newspapers, on the Internet and in other media worldwide, including the official Hamilton website, www.hamiltonwatch.com. The Hamilton Marks qualify as famous marks as that term is used in 15 U.S.C. §1125(c)(1).

49.     Further, Hamilton extensively uses, advertises and promotes the Hamilton Marks in the United States in connection with the sale of high-quality goods. As a result, the Hamilton Marks are widely recognized trademarks in the United States, and the trademarks have achieved secondary meaning as identifiers of high-quality goods.

50.     Hamilton has carefully monitored and policed the use of the Hamilton Marks and has never assigned or licensed the Hamilton Marks to any of the Defendants in this matter.

51.     Genuine goods bearing the Hamilton Marks are widely legitimately advertised and promoted by Hamilton and related companies, authorized distributors and unrelated third parties via the Internet.  Over the course of the past several years, visibility on the Internet, particularly via Internet search engines such as Google, Yahoo!, and Bing has become increasingly important to Hamilton's overall marketing and consumer education efforts. Thus, Hamilton and related companies expend significant monetary resources on Internet marketing and consumer education, including SEO strategies. Those strategies allow Hamilton and its authorized retailers to fairly and legitimately educate consumers about the value associated with the Hamilton Marks and the goods sold thereunder. Similarly, Defendants' individual seller stores are indexed on search engines and compete directly with Hamilton for space in the search results.

**Jaquet Droz's Rights**

52.     Jaquet Droz is the owner of the following trademarks which are valid and

registered on the Principal Register of the United States Patent and Trademark Office (the

"Jaquet Droz Marks"):

| Trademark | Registration Number | Registration Date | Class / Goods |
|---|---|---|---|
| JAQUET-DROZ | 725,758 | December 26, 1961 | IC 014. Watches, Parts of Watches, Watch Dials, and Alarm Clocks. |
| ✳ ✳ | 3,288,314 | September 4, 2007 | IC 014. Horological and chronometric instruments. |
| J✳D | 4,677,315 | January 27, 2015 | IC 014. Precious metals and their alloys and goods in precious metals or coated therewith included in this class, namely, jewelry, jewelry boxes, jewelry caskets, precious stones; horological and chronometric instruments, watch chains, caskets for watches, cases for the presentation of watches. |
| JAQUET DROZ | 5,511,973 | July 10, 2018 | IC 014. Precious metals and their alloys and goods made of these materials or coated therewith included in this class, namely, split rings for keys, busts, statues, figurines, trophies, badges, medals, medallions, ornamental lapel pins, hat ornaments being hat jewelry of precious metal, footwear ornaments being footwear jewelry of precious metal; jewelry, namely, rings, earrings, cuff links, bracelets, charms, brooches, chains, necklaces, tie pins, tie clips, jewelry caskets, jewelry cases; precious stones, semi-precious stones; timepieces and chronometric instruments, namely, chronometers, chronographs, clocks, watches, wristwatches, wall clocks, alarm clocks; Parts for chronometers, chronographs, clocks, watches, wristwatches, wall clocks and alarm clocks, namely, hands, anchors, |

| | | | pendulums, barrels, watch cases, watch straps, watch dials, clockworks, watch chains, movements for timepieces, rough watch movements, watch springs, watch glasses; Accessories for chronometers, chronographs, clocks, watches, wristwatches, wall clocks, and alarm clocks, namely, watch cases, presentation cases for timepieces, cases for timepieces. |
|---|---|---|---|

The Jaquet Droz Marks are used in connection with the manufacture and distribution of high-quality goods in the category identified above. True and correct copies of the Certificates of Registration for the Jaquet Droz Marks are attached hereto as Composite Exhibit "6."

53.     Long before the Defendants began their infringing activities complained of herein, the Jaquet Droz Marks have been used by Jaquet Droz in interstate commerce to identify and distinguish Jaquet Droz's high-quality goods for an extended period of time and serve as symbols of Jaquet Droz's quality, reputation and goodwill.

54.     Jaquet Droz expends substantial resources developing, advertising and otherwise promoting the Jaquet Droz Marks.  Jaquet Droz and related companies have spent significant monetary resources to extensively advertise and promote products under the Jaquet Droz Marks in magazines, newspapers, on the Internet and in other media worldwide, including the official Jaquet Droz website, www.jaquet-droz.com. The Jaquet Droz Marks qualify as famous marks as that term is used in 15 U.S.C. §1125(c)(1).

55.     Further, Jaquet Droz extensively uses, advertises and promotes the Jaquet Droz Marks in the United States in connection with the sale of high-quality goods. As a result, the Jaquet Droz Marks are widely recognized trademarks in the United States, and the trademarks have achieved secondary meaning as identifiers of high-quality goods.

56.     Jaquet Droz has carefully monitored and policed the use of the Jaquet Droz Marks and has never assigned or licensed the Jaquet Droz Marks to any of the Defendants in this matter.

57.     Genuine goods bearing the Jaquet Droz Marks are widely legitimately advertised and promoted by Jaquet Droz and related companies, authorized distributors and unrelated third parties via the Internet.  Over the course of the past several years, visibility on the Internet, particularly via Internet search engines such as Google, Yahoo!, and Bing has become increasingly important to Jaquet Droz's overall marketing and consumer education efforts. Thus, Jaquet Droz and related companies expend significant monetary resources on Internet marketing and consumer education, including SEO strategies. Those strategies allow Jaquet Droz and its authorized retailers to fairly and legitimately educate consumers about the value associated with the Jaquet Droz Marks and the goods sold thereunder. Similarly, Defendants' individual seller stores are indexed on search engines and compete directly with Jaquet Droz for space in the search results.

**Tissot's Rights**

58.     Tissot is the owner of the following trademarks which are valid and registered on the Principal Register of the United States Patent and Trademark Office (the "Tissot Marks"):

| Trademark | Registration Number | Registration Date | Class / Goods |
|---|---|---|---|
| **TISSOT** | 1,639,684 | April 2, 1991 | IC 014. watches; parts, fittings and fixtures for watches |
| **POWERMATIC** | 2,702,854 | April 1, 2003 | IC 014. Electronic watches energized by the wearer, and their parts |
| CHEMIN DES TOURELLES | 4,867,720 | December 8, 2015 | IC 014. Horological and chronometric instruments |
| (T) | 4,900,255 | February 16, 2016 | IC 014. Horological and chronometric instruments. |

| T | 4,971,556 | June 7, 2016 | IC 014. Horological and chronometric instruments. |
|---|---|---|---|

The Tissot Marks are used in connection with the manufacture and distribution of high-quality goods in the category identified above. True and correct copies of the Certificates of Registration for the Tissot Marks are attached hereto as Composite Exhibit "7."

59.     Long before the Defendants began their infringing activities complained of herein, the Tissot Marks have been used by Tissot in interstate commerce to identify and distinguish Tissot's high-quality goods for an extended period of time and serve as symbols of Tissot's quality, reputation and goodwill.

60.     Tissot expends substantial resources developing, advertising and otherwise promoting the Tissot Marks.  Tissot and related companies have spent significant monetary resources to extensively advertise and promote products under the Tissot Marks in magazines, newspapers, on the Internet and in other media worldwide, including the official Tissot website, www.tissotwatches.com. The Tissot Marks qualify as famous marks as that term is used in 15 U.S.C. §1125(c)(1).

61.     Further, Tissot extensively uses, advertises and promotes the Tissot Marks in the United States in connection with the sale of high-quality goods. As a result, the Tissot Marks are widely recognized trademarks in the United States, and the trademarks have achieved secondary meaning as identifiers of high-quality goods.

62.     Tissot has carefully monitored and policed the use of the Tissot Marks and has never assigned or licensed the Tissot Marks to any of the Defendants in this matter. Genuine goods bearing the Tissot Marks are widely legitimately advertised and promoted by Tissot and related companies, authorized distributors and unrelated third parties via the Internet. Over the course of the past several years, visibility on the Internet, particularly via Internet

22

search engines such as Google, Yahoo!, and Bing has become increasingly important to Tissot's overall marketing and consumer education efforts. Thus, Tissot and related companies expend significant monetary resources on Internet marketing and consumer education, including SEO strategies. Those strategies allow Tissot and its authorized retailers to fairly and legitimately educate consumers about the value associated with the Tissot Marks and the goods sold thereunder. Similarly, Defendants' individual seller stores are indexed on search engines and compete directly with Tissot for space in the search results.

**Defendants' Infringing Activities**

63.      Defendants are promoting and advertising, distributing, selling and/or offering for sale goods in interstate commerce bearing counterfeit and confusingly similar imitations of one or more of the Omega Marks, Blancpain Marks, Longines Marks, Glashütte Original Mark, Hamilton Marks, Jaquet Droz Marks, and/or Tissot Marks (the "Counterfeit Goods") through at least the Internet based e-commerce stores operating under the Seller IDs.  Specifically, Defendants are using the Omega Marks, Blancpain Marks, Longines Marks, Glashütte Original Mark, Hamilton Marks, Jaquet Droz Marks, and/or Tissot Marks (collectively, "Plaintiffs' Marks") to initially attract online consumers and drive them to Defendants' e-commerce stores operating under the Seller IDs.  Defendants are using virtually identical copies of one or more Plaintiffs' Marks for different quality goods.  Plaintiffs have used Plaintiffs' Marks extensively and continuously before Defendants began offering counterfeit and confusingly similar imitations of Plaintiffs' goods.

64.      Defendants' Counterfeit Goods are of a quality substantially different than that of Plaintiffs' genuine goods.  Defendants are actively using, promoting and otherwise advertising, distributing, selling and/or offering for sale substantial quantities of their Counterfeit Goods with

the knowledge and intent that such goods will be mistaken for the genuine, high quality goods offered for sale by Plaintiffs despite Defendants' knowledge that they are without authority to use Plaintiffs' Marks.  The net effect of Defendants' actions is likely to cause confusion of consumers at the time of initial interest, sale, and in the post-sale setting, who will believe all of Defendants' goods offered for sale in Defendants' e-commerce stores are genuine goods originating from, associated with, and/or approved by Plaintiffs.

65.     Defendants advertise their e-commerce stores, including their Counterfeit Goods offered for sale, to the consuming public via at least the e-commerce stores under the Seller IDs. In so advertising their stores and goods, Defendants improperly and unlawfully use one or more of Plaintiffs' Marks without Plaintiffs' permission.

66.     As part of their overall counterfeiting and infringement scheme, Defendants are, upon information and belief, concurrently employing and benefitting from substantially similar advertising and marketing strategies based, in large measure, upon an illegal use of counterfeits and infringements of one or more of Plaintiffs' Marks.  Specifically, Defendants are using counterfeits and infringements of one or more of Plaintiffs' Marks in order to make their e-commerce stores selling illegal goods appear more relevant and attractive to consumers searching for both Plaintiffs' and non-Plaintiffs' goods and information online.  By their actions, Defendants are contributing to the creation and maintenance of an illegal marketplace operating in parallel to the legitimate marketplace for Plaintiffs' genuine goods.  Defendants are causing individual, concurrent and indivisible harm to Plaintiffs and the consuming public by (i) depriving Plaintiffs of their right to fairly compete for space online and within search engine results and reducing the visibility of Plaintiffs' genuine goods on the World Wide Web, (ii) causing an overall degradation of the value of the goodwill associated with Plaintiffs' Marks, and

(iii) increasing Plaintiffs' overall cost to market their goods and educate consumers about their brands via the Internet.

67.     Defendants are concurrently conducting and targeting their counterfeiting and infringing activities toward consumers and likely causing unified harm within this district and elsewhere throughout the United States.  As a result, Defendants are defrauding Plaintiffs and the consuming public for Defendants' own benefit.

68.     At all times relevant hereto, Defendants in this action had full knowledge of Plaintiffs' ownership of Plaintiffs' Marks, including their exclusive rights to use and license such intellectual property and the goodwill associated therewith.

69.     Defendants' use of Plaintiffs' Marks, including the promotion and advertisement, reproduction, distribution, sale, and offering for sale of their Counterfeit Goods, is without Plaintiffs' consent or authorization.

70.     Defendants are engaging in the above-described illegal counterfeiting and infringing activities knowingly and intentionally or with reckless disregard or willful blindness to Plaintiffs' rights for the purpose of trading on Plaintiffs' goodwill and reputations.  If Defendants' intentional counterfeiting and infringing activities are not preliminarily and permanently enjoined by this Court, Plaintiffs and the consuming public will continue to be harmed.

71.     Defendants' above identified infringing activities are likely to cause confusion, deception and mistake in the minds of consumers before, during, and after the time of purchase. Moreover, Defendants' wrongful conduct is likely to create a false impression and deceive customers, the public, and the trade into believing there is a connection or association between Plaintiffs' genuine goods and Defendants' Counterfeit Goods, which there is not.

72.     Given the visibility of Defendants' various e-commerce stores and the similarity of their actions, it is clear Defendants are either affiliated, or at a minimum, cannot help but know of each other's existence and the unified harm likely to be caused to Plaintiffs and the overall consumer market in which they operate as a result of Defendants' concurrent actions.

73.     Although some Defendants may be physically acting independently, they may properly be deemed to be acting in concert because the combined force of their actions serves to multiply the harm caused to Plaintiffs.

74.     Defendants' payment and financial accounts, including but not limited to those specifically set forth on Schedule "A," are being used by Defendants to accept, receive, and deposit profits from Defendants' trademark counterfeiting and infringing and unfairly competitive activities connected to their Seller IDs and any other alias seller identification names being used and/or controlled by them.

75.     Further, Defendants are likely to transfer or secret their assets to avoid payment of any monetary judgment awarded to Plaintiffs.

76.     Plaintiffs have no adequate remedy at law.

77.     Plaintiffs are suffering irreparable injury and have suffered substantial damages as a result of Defendants' unauthorized and wrongful use of Plaintiffs' Marks.  If Defendants' counterfeiting and infringing, and unfairly competitive activities are not preliminarily and permanently enjoined by this Court, Plaintiffs and the consuming public will continue to be harmed.

78.     The harm and damages sustained by Plaintiffs have been directly and proximately caused by Defendants' wrongful reproduction, use, advertisement, promotion, offers to sell, and sale of their Counterfeit Goods.

## COUNT I - TRADEMARK COUNTERFEITING AND INFRINGEMENT
## PURSUANT TO § 32 OF THE LANHAM ACT (15 U.S.C. § 1114)

79.     Plaintiffs hereby adopt and re-allege the allegations set forth in Paragraphs 1 through 78 above.

80.     This is an action for trademark counterfeiting and infringement against Defendants based on their use of counterfeit and confusingly similar imitations of Plaintiffs' Marks in commerce in connection with the promotion, advertisement, distribution, offering for sale and/or sale of the Counterfeit Goods.

81.     Specifically, Defendants are promoting and otherwise advertising, selling, offering for sale, and distributing goods using counterfeits and/or infringements of one or more of Plaintiffs' Marks.  Defendants are continuously infringing and inducing others to infringe Plaintiffs' Marks by using one or more of Plaintiffs' Marks to advertise, promote, offer to sell and/or sell counterfeit and infringing versions of Plaintiffs' branded goods.

82.     Defendants' concurrent counterfeiting and infringing activities are likely to cause and actually are causing confusion, mistake, and deception among members of the trade and the general consuming public as to the origin and quality of Defendants' Counterfeit Goods.

83.     Defendants' unlawful actions have caused and are continuing to cause unquantifiable damages to Plaintiffs and are unjustly enriching Defendants with profits at Plaintiffs' expense.

84.     Defendants' above-described illegal actions constitute counterfeiting and infringement of Plaintiffs' Marks in violation of Plaintiffs' rights under § 32 of the Lanham Act, 15 U.S.C. § 1114.

85.     Plaintiffs have suffered and will continue to suffer irreparable injury and damages due to Defendants' above described activities if Defendants are not preliminarily and

permanently enjoined. Additionally, Defendants will continue to wrongfully profit from their illegal activities.

## COUNT II - FALSE DESIGNATION OF ORIGIN
## PURSUANT TO § 43(a) OF THE LANHAM ACT (15 U.S.C. § 1125(a))

86.     Plaintiffs hereby adopt and re-allege the allegations set forth in Paragraphs 1 through 78 above.

87.     Defendants' Counterfeit Goods bearing, offered for sale, and sold using copies of one or more of Plaintiffs' Marks have been widely advertised and offered for sale throughout the United States via the Internet.

88.     Defendants' Counterfeit Goods bearing, offered for sale and sold using copies of one or more of Plaintiffs' Marks are virtually identical in appearance to Plaintiffs' genuine goods.  However, Defendants' Counterfeit Goods are different in quality.  Accordingly, Defendants' activities are likely to cause confusion in the trade and among the general public as to at least the origin or sponsorship of their Counterfeit Goods.

89.     Defendants, have used in connection with their advertisement, offer for sale, and sale of the Counterfeit Goods, false designations of origin and false descriptions and representations, including words or other symbols and trade dress which tend to falsely describe or represent such goods and have caused such goods to enter into commerce with full knowledge of the falsity of such designations of origin and such descriptions and representations, all to Plaintiffs' detriment.

90.     Defendants have authorized infringing uses of one or more of Plaintiffs' Marks in Defendants' advertisement and promotion of their counterfeit and infringing branded goods. Some Defendants have also misrepresented to members of the consuming public that the Counterfeit Goods being advertised and sold by them are genuine, non-infringing goods,

28

91.     Additionally, many Defendants are using counterfeits and infringements of one or more of Plaintiffs' Marks in order to unfairly compete with Plaintiffs and others for space within organic search engine and social media results, thereby jointly depriving Plaintiffs of a valuable marketing and educational tool which would otherwise be available to Plaintiffs and reducing the visibility of Plaintiffs' genuine goods on the World Wide Web and across social media platforms.

92.     Defendants' above-described actions are in violation of Section 43(a) of the Lanham Act, 15 U.S.C. §1125(a).

93.     Plaintiffs have no adequate remedy at law and have sustained indivisible injury and damage caused by Defendants' concurrent conduct.  Absent an entry of an injunction by this Court, Defendants will continue to wrongfully reap profits and Plaintiffs will continue to suffer irreparable injury to their goodwill and business reputations, as well as monetary damages.

## COUNT III - COMMON LAW UNFAIR COMPETITION

94.     Plaintiffs hereby adopt and re-allege the allegations set forth in Paragraphs 1 through 78 above.

95.     This is an action against Defendants based on their promotion, advertisement, distribution, sale and/or offering for sale of goods using or bearing marks which are virtually identical to one or more of Plaintiffs' Marks in violation of Florida's common law of unfair competition.

96.     Specifically, Defendants are promoting and otherwise advertising, selling, offering for sale, and distributing infringing and counterfeit versions of Plaintiffs' branded goods.  Defendants are also using counterfeits and infringements of one or more of Plaintiffs'

Marks to unfairly compete with Plaintiffs and others for (i) space in search engine and social media results across an array of search terms and (ii) visibility on the World Wide Web.

97.     Defendants' infringing activities are likely to cause and actually are causing confusion, mistake, and deception among members of the trade and the general consuming public as to the origin and quality of Defendants' e-commerce stores as a whole and all products sold therein by their use of Plaintiffs' Marks.

98.     Plaintiffs have no adequate remedy at law and are suffering irreparable injury and damages as a result of Defendants' actions.

## COUNT IV - COMMON LAW TRADEMARK INFRINGEMENT

99.     Plaintiffs hereby adopt and re-allege the allegations set forth in Paragraphs 1 through 78 above.

100.    This is an action for common law trademark infringement against Defendants based on their promotion, advertisement, offering for sale, and/or sale of their Counterfeit Goods bearing one or more of Plaintiffs' Marks.  Plaintiffs are the owners of all common law rights in and to Plaintiffs' Marks.

101.    Specifically, Defendants are promoting and otherwise advertising, distributing, offering for sale, and selling goods using and bearing infringements of one or more of Plaintiffs' Marks.

102.    Defendants' infringing activities are likely to cause and actually are causing confusion, mistake and deception among members of the trade and the general consuming public as to the origin and quality of Defendants' Counterfeit Goods bearing Plaintiffs' Marks.

103.    Plaintiffs have no adequate remedy at law and are suffering damages and irreparable injury as a result of Defendants' actions.

## PRAYER FOR RELIEF

104.     WHEREFORE, Plaintiffs demand judgment on all Counts of this Complaint and

an award of equitable relief and monetary relief against Defendants as follows:

a.     Entry of a temporary restraining order, as well as preliminary and

permanent injunctions pursuant to 15 U.S.C. § 1116 and Federal Rule of Civil Procedure 65

enjoining Defendants, their agents, representatives, servants, employees, and all those acting in

concert or participation therewith, from manufacturing or causing to be manufactured, importing,

advertising or promoting, distributing, selling or offering to sell their Counterfeit Goods; from

infringing, counterfeiting, or diluting Plaintiffs' Marks; from using Plaintiffs' Marks, or any

mark or design similar thereto, in connection with the sale of any unauthorized goods; from

using any logo, trade name or trademark or design that may be calculated to falsely advertise the

services or goods of Defendants as being sponsored by, authorized by, endorsed by, or in any

way associated with Plaintiffs; from falsely representing themselves as being connected with

Plaintiffs, through sponsorship or association, or engaging in any act that is likely to falsely

cause members of the trade and/or of the purchasing public to believe any goods or services of

Defendants are in any way endorsed by, approved by, and/or associated with Plaintiffs; from

using any reproduction, counterfeit, infringement, copy, or colorable imitation of Plaintiffs'

Marks in connection with the publicity, promotion, sale, or advertising of any goods sold by

Defendants; from affixing, applying, annexing or using in connection with the sale of any goods,

a false description or representation, including words or other symbols tending to falsely describe

or represent Defendants' goods as being those of Plaintiffs, or in any way endorsed by Plaintiffs

and from offering such goods in commerce; from engaging in search engine optimization

strategies using colorable imitations of Plaintiffs' names or trademarks; and from otherwise unfairly competing with Plaintiffs.

   b. Entry of a temporary restraining order, as well as preliminary and permanent injunctions pursuant to 28 U.S.C. § 1651(a), The All Writs Act, and the Court's inherent authority, enjoining Defendants and all third parties with actual notice of an injunction issued by the Court from participating in, including providing financial services, technical services or other support to, Defendants in connection with the sale and distribution of non-genuine goods bearing and/or using counterfeits of Plaintiffs' Marks.

   c. Entry of an order pursuant to 28 U.S.C. § 1651(a), The All Writs Act, and the Court's inherent authority, that upon Plaintiffs' request, the applicable governing Internet marketplace website operators and/or administrators for the Seller IDs who are provided with notice of an injunction issued by the Court disable and/or cease facilitating access to the Seller IDs and any other alias seller identification names being used and/or controlled by Defendants to engage in the business of marketing, offering to sell, and/or selling goods bearing counterfeits and infringements of Plaintiffs' Marks.

   d. Entry of an order pursuant to 28 U.S.C. § 1651(a), The All Writs Act, and the Court's inherent authority, that, upon Plaintiffs' request, any Internet marketplace website operators and/or administrators for the Seller IDs who are provided with notice of an injunction issued by the Court identify any e-mail address known to be associated with Defendants' respective Seller ID.

   e. Entry of an order pursuant to 28 U.S.C. § 1651(a), The All Writs Act, and the Court's inherent authority, that, upon Plaintiffs' request, any Internet marketplace website operators and/or administrators who are provided with notice of an injunction issued by the

Court permanently remove from the multiple platforms, which include, inter alia, a Direct platform, Group platform, Seller Product Management platform,  Vendor Product Management platform, and Brand Registry platform, any and all listings and associated images of goods bearing counterfeits and/or infringements of Plaintiffs' Marks via the e-commerce stores operating under the Seller IDs, and upon Plaintiffs' request, any other listings and images of goods bearing counterfeits and/or infringements of Plaintiffs' Marks associated with and/or linked to the same sellers or linked to any other alias seller identification names being used and/or controlled by Defendants to promote, offer for sale and/or sell goods bearing counterfeits and/or infringements of Plaintiffs' Marks.

       f.     Entry of an order pursuant to 28 U.S.C. § 1651(a), The All Writs Act, and the Court's inherent authority, that upon Plaintiffs' request, Defendants and any Internet marketplace website operators and/or administrators who are provided with notice of an injunction issued by the Court, immediately cease fulfillment of and sequester all goods of each Defendant bearing one or more of Plaintiffs' Marks in its inventory, possession, custody, or control, and surrender those goods to Plaintiffs.

       g.     Entry of an order requiring Defendants to account to and pay Plaintiffs for all profits and damages resulting from Defendants' trademark counterfeiting and infringing and unfairly competitive activities and that the award to Plaintiffs be trebled, as provided for under 15 U.S.C. §1117, or, at Plaintiffs' election with respect to Count I, that Plaintiffs be awarded statutory damages from each Defendant in the amount of two million dollars ($2,000,000.00) per each counterfeit trademark used and product type sold, as provided by 15 U.S.C. §1117(c)(2) of the Lanham Act.

h.      Entry of an award pursuant to 15 U.S.C. § 1117 (a) and (b) of Plaintiffs'

costs and reasonable attorneys' fees and investigative fees associated with bringing this action.

i.      Entry of an order that, upon Plaintiffs' request, Defendants and any

financial institutions, payment processors, banks, escrow services, money transmitters, or

marketplace platforms, and their related companies and affiliates, identify and restrain all funds,

up to and including the total amount of judgment, in all financial accounts and/or sub-accounts

used in connection with the Seller IDs or other alias seller identification or e-commerce store

names, domain names and/or websites used by Defendants presently or in the future, as well as

any other related accounts of the same customer(s) and any other accounts which transfer funds

into the same financial institution account(s), and remain restrained until such funds are

surrendered to Plaintiffs in partial satisfaction of the monetary judgment entered herein.

j.      Entry of an award of pre-judgment interest on the judgment amount.

k.      Entry of an order for any further relief as the Court may deem just and

proper.

DATED: September 30, 2020.            Respectfully submitted,

                                     STEPHEN M. GAFFIGAN, P.A.

                                     By: **Stephen M. Gaffigan**
                                     Stephen M. Gaffigan (Fla. Bar No. 025844)
                                     Virgilio Gigante (Fla. Bar No. 082635)
                                     T. Raquel Wiborg-Rodriguez (Fla. Bar. No. 103372)
                                     401 East Las Olas Blvd., Suite 130-453
                                     Ft. Lauderdale, Florida 33301
                                     Telephone: (954) 767-4819
                                     E-mail: Stephen@smgpa.net
                                     E-mail: Leo@smgpa.net
                                     E-mail: Raquel@smgpa.net

                                     Attorneys for Plaintiffs

**SCHEDULE "A"**

**[This page is the subject of Plaintiffs' Motion to File Under Seal.  As such, this page has been redacted in accordance with L.R. 5.4(b)(1)]**